SANDRA J. HARRIS
NICOLAS MORGAN
KELLY BOWERS
MARTIN J. MURPHY
E. DAVID HWA
NICHOLAS S. CHUNG

FILED

00 SEP 21  PM 12: 55

CLERK, U.S. DISTRICT COURT
DISTRICT OF OREGON
PORTLAND, OREGON
BY

Attorneys for Plaintiff
Securities and Exchange Commission
Valerie Caproni, Regional Director
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California  90036-3648
Phone: (323) 965-3998
Fax:   (323) 965-3908
Email:  morgann@sec.gov

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

SECURITIES AND EXCHANGE COMMISSION,

PLAINTIFF,

vs.

CAPITAL CONSULTANTS, LLC, JEFFREY L. GRAYSON, and BARCLAY L. GRAYSON,

DEFENDANTS.

Case No. CV'00 -1290 KI

COMPLAINT FOR FEDERAL SECURITIES LAW VIOLATIONS

Plaintiff Securities and Exchange Commission ("Commission") for its Complaint alleges:

## JURISDICTION

1.    The Commission brings this action pursuant to the authority conferred upon it by Sections 20(b) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b) and 77v(a), Sections 21(d), 21(e) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e) and 78aa, and Section 209(d) of the Advisers Act, 15 U.S.C. § 80b-

COMPLAINT

9(d).  The Commission also seeks civil penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. §77t(d), Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), and Section 209(e) of the Advisers Act, 15 U.S.C. § 80b-9(e).  Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged herein.

## SUMMARY

2.    This action involves an ongoing Ponzi-like scheme by a registered investment adviser, Capital Consultants, LLC ("CCL"), and its two principals, Jeffrey L. Grayson ("J. Grayson") and his son Barclay L. Grayson ("B. Grayson").  The Defendants have committed fraud in their offer and sale of, and reporting on the value and status of, securities to their advisory clients.

3.    CCL manages more than $1 billion for approximately 340 clients, most of which are pension trust funds and individuals. The Defendants have invested approximately $400 million of client funds in securities in the form of participation interests in loans that CCL, as agent for its clients, has made to various businesses.

4.    In the latter half of 1998, the borrower of a $160 million CCL loan had severe financial problems; in early 1999, the borrower was reorganized in bankruptcy, and the loan was discharged in bankruptcy.  CCL and the Graysons, however, continued to report to their clients that the loan had a value of

- 2 -      COMPLAINT

$160 million, premised on the purported sale of the loan to two other entities.  Moreover, while these representations were made, Defendants continued to sell to clients participation interests in the loan at the full value.

5.    In fact, the Defendants have funded loan payments on the $160 million loan through a Ponzi-like scheme, whereby they have loaned an additional $71 million of client funds to the entities that purportedly purchased the $160 million loan to enable them to make the loan payments.  The Defendants have not disclosed this scheme to their clients, nor have they disclosed other material information (including the fact that the new entities have the right to terminate their agreement to purchase the $160 million loan at any time, for any reason, and without further liability).

6.    In furtherance of their fraud, the Defendants have also declared the market value of the participation interests in the $160 million loan and the additional $71 million in loans to be their face value (rather than at a highly discounted value to reflect the uncertainty of repayment) and billed the clients a 3% management fee based on that value.

7.    The Commission seeks to enjoin each Defendant from engaging in the transactions, acts, practices and courses of business alleged in this Complaint, and transactions, acts, practices and courses of business of similar purport and object, for other equitable relief, for payment of civil penalties and for such further relief as the Court may deem appropriate.

- 3 -      COMPLAINT

## THE DEFENDANTS

8.   **Capital Consultants, LLC** ("CCL") is a registered investment adviser located in Portland, Oregon, managing over $1 billion for approximately 340 clients.

9.   **Jeffrey L. Grayson**, age 58, is a resident of Portland, Oregon.  He is the founder, principal owner (62.5% shareholder), Chairman of the Board, and Chief Executive Officer of CCL.

10.  **Barclay L. Grayson**, age 30, is a resident of Portland Oregon.  He is an 18.75% shareholder and director and the president of CCL.

## RELATED ENTITIES AND INDIVIDUAL

11.  **Wilshire Credit Corp.** ("Wilshire") was a private corporation that serviced loans acquired from various lenders. Between 1994 and October 16, 1998, Wilshire and an affiliated company borrowed a total of approximately $160 million (the "Wilshire Loan") from CCL.

12.  **Wilshire Financial Services Group, Inc.** ("WFSG") is a public Delaware corporation created in 1996 as part of a prior reorganization of Wilshire.

13.  **Daniel D. Dyer** ("Dyer") is a principal of various entities that have business relationships with CCL, including:

a.   **Sterling Capital, LLC** ("Sterling") was formed on November 24, 1998, and in December 1998 agreed to purchase the Wilshire Loan from CCL after Wilshire declared bankruptcy and the Wilshire Loan had been discharged;

b.   **Oxbow Capital Partners, LLC** ("Oxbow Partners") is the promoter and manager of Oxbow Fund I and Oxbow Fund B;

- 4 -     COMPLAINT

c.    **Oxbow Capital 1999 Fund I, LLC** ("Oxbow Fund I") was formed on January 12, 1999.  From March 1999 through October 1999, Oxbow Fund I conducted a $25 million offering, raising $4.6 million from investors.  The Oxbow Fund I offering was promoted and managed by Oxbow Partners;

d.    **Oxbow Capital 1999 Fund B, LLC** ("Oxbow Fund B") was created in July 1999 to receive investments by Brooks Financial LLC.  Since July 1999, it has conducted a $25 million offering promoted and sold by Oxbow Partners, and has raised at least $8.86 million from Brooks Financial, LLC and Beacon Financial, LLC;

14.    **Brooks Financial, LLC** ("Brooks") was formed on June 4, 1999, and immediately agreed to borrow up to $50 million (the "Brooks Loan") from CCL and to purchase $108 million of the Wilshire Loan from Sterling.  Brooks was involved in the Defendants' scheme in that it used the proceeds of the $50 million loan to make payments on the Wilshire Loan.

15.    **Beacon Financial, LLC** ("Beacon"), which is under common control with Brooks, agreed in January 2000 to borrow up to $50 million (the "Beacon Loan") from CCL.

## GENERAL ALLEGATIONS

### Background

### CCL and the Loan Participation Interests

16.    As of May 31, 2000, CCL had about 340 clients, primarily union pension funds and individuals, and managed about $1 billion, of which $481 million was invested in various private investments, including $319 million in its Cash Collateralized

- 5 -      COMPLAINT

Note Program (the "Note Program").  Defendants owed CCL's clients an affirmative duty of utmost good faith and fair disclosure of all material facts concerning the Note Program.

17.  In the Note Program, the Defendants invest client funds in participation interests in loans made by CCL to borrowers who secure the loans with an assignment of the borrowers' receivables.  For clients who participate in the Note Program, the Defendants generally have discretionary authority to invest the clients' funds in loan participation interests.  For funds invested in loan participation interests, CCL receives from its clients a 3% annual fee based on the investments' stated value.

18.  The Defendants represent to clients that the Note Program is "low risk" and "do[es] not carry a significantly higher level of risk" than "government securities, money market funds, commercial paper, and guaranteed investment contracts."

19.  The Defendants also represent to clients that the Note Program's objectives are to provide:  "maximum current income consistent with preservation of investment capital"; and "control of portfolio risk through active management and credit quality." The Defendants further represent that the Note Program's investment guidelines and procedures include:  "active management of financing relationships"; "appropriate security interest in all collateral for each loan"; and "additional collateral equal to 15% of the loan balance in the form of cash, marketable securities or cash equivalent collateral."

20.  The Defendants also provide clients with periodic updates regarding their investments in the Note Program.  On a

- 6 -      COMPLAINT

quarterly basis, it also appraises the "market value" of the account and sends the appraisal to the client. The Defendants also bill the clients for CCL's advisory fee on a quarterly basis.

21. Defendants J. and B. Grayson were directly involved in the Note Program, including negotiating with clients their investment in the Note Program, ultimately whether to make particular loans under the Note Program, determining which clients were invested in a particular loan, and participating in the preparation and review of the quarterly reports sent to clients regarding their investments. After January 1999, the Graysons were responsible for communicating with clients who were invested in the Wilshire Loan.

### The Wilshire Loan, WFSG's Bankruptcy, and the Discharge of the Wilshire Loan

22. Between 1994 and October 16, 1998, CCL, as agent for its clients, loaned Wilshire a total of about $160 million (the "Wilshire Loan"). On November 23, 1998, Wilshire's affiliated public company, WFSG, announced that it was having financial problems, that it had reached an agreement to restructure its debts, including the Wilshire Loan, and that the restructuring could entail a bankruptcy proceeding.

23. As part of the restructuring, in a November 21, 1998 agreement as amended on January 19, 1999, CCL released its claims for repayment of the Wilshire Loan in exchange for 100% of the non-voting shares of a WFSG subsidiary, which shares could be

- 7 -    COMPLAINT

converted after two years into up to 42.75% of WSFG's outstanding common stock as of the restructuring.

24.  On March 3, 1999, WFSG filed a Chapter 11 bankruptcy reorganization plan, which was approved on April 12, 1999.

25.  In November and December 1998, WSFG provided to CCL projections estimating that CCL's WSFG stock would have a value in 1999 of $31.78 million.  As of January 26, 1999, WFSG had a market capitalization of $4.5 million (11,070,000 shares outstanding x $0.406 per share); therefore, assuming CCL exercised its right to convert into 42.75% of WFSG stock and the market capitalization did not increase, its stock would be worth only $1.9 million (i.e., 42.75% x $4.5 million).  WFSG's reorganization plan valued the $160 million Wilshire Loan at only $6.45 million on a liquidation basis.

26.  CCL made the December 1998 and January, February, and March 1999 payments on the Wilshire Loan (approximately $1.53 to $1.73 million per month) out of the loan's cash collateral account.

**Sterling's Agreement to Purchase**

**the Wilshire Loan**

27.  On December 18, 1998, J. Grayson (on behalf of CCL) and Dyer (on behalf of Sterling) signed a "Term Sheet" under which Sterling agreed to purchase from CCL the Wilshire Loan for the full $160 million balance owing and all accrued interest. Sterling agreed to pay CCL no less than $2.5 million toward the purchase price beginning January 25, 1999, and on the 25th day of

- 8 -      COMPLAINT

each month thereafter until January 25, 2004, when the loan would be due and payable in full.  The Term Sheet provided, however, that if Sterling failed to pay any amount due under the agreement, the "agreement would be automatically terminated without further liability to Sterling."

28.  On February 1, 1999, CCL and Sterling finalized the loan purchase agreement, which provided that Sterling agreed to begin its monthly payments on March 25, 1999 (instead of January 25, 1999) and to make a $3.11 million initial deposit to CCL on or before March 31, 1999.  In the final agreement, Sterling retained the right to terminate payments without further liability.

### Sterling's Failure to Make Payments
### and the Graysons' Proposal to Sell
### a Portion of the Wilshire Loan

29.  At least by the time Dyer signed the Term Sheet, he frequently discussed with J. Grayson that Sterling had no funds, or intention, to pay under the Term Sheet until a venture fund he was forming (Oxbow Fund I) began raising money, that the venture fund had not been approved for sale, and that he was uncertain when the venture fund would be approved.

30.  In March 1999, Oxbow Partners began conducting a private placement offering of Oxbow Fund I to raise $25 million. By March 31, 1999 (by which time Sterling was to have paid CCL $5.61 million for the Wilshire Loan), however, Oxbow Fund I had not received any funds from investors.  When the offering ceased in October 1999, Oxbow Fund I had raised only $4.6 million.

- 9 -     COMPLAINT

31.  On or about May 23, 1999, Dyer told the Graysons that Sterling could not make the Wilshire Loan payments and that he wanted to terminate the agreement to buy the loan.  The Graysons proposed instead that Sterling decrease its payments by selling a portion of the Wilshire Loan to a third party.  The Graysons told Dyer that they had a borrower that was increasing its loan by $50 million and that the borrower should be able to take some of its profits from use of the additional loan proceeds to acquire a portion of the Wilshire Loan.  Dyer thought that Sterling could make a $500,000 monthly payment and agreed to the Graysons' proposal to sell two-thirds of the Wilshire Loan to the third party arranged by J. Grayson.

32.  On May 25, 1999, CCL and Sterling amended their loan purchase agreement.  Under the amendment, Sterling's date for making an initial deposit was postponed from March 31, 1999, to January 1, 2004, and its monthly payment was reduced from $2.5 million principal and interest payments to $1.533 million interest only payments.  CCL also waived its right to receive $2.5 million payments due in March and April 1999.

### The Brooks Loan, Brooks' Agreement to Buy
### a Portion of the Wilshire Loan, and
### the Defendants' Use of Brooks Loan Proceeds
### to Make Wilshire Loan Interest Payments

33.  On June 4, 1999, Brooks entered into related and dependent agreements with CCL and with Sterling.  In the first agreement, CCL, as agent for its clients, agreed to lend Brooks up to $50 million for the purpose of funding Brooks' purchase

- 10 -      COMPLAINT

receivables and purchase of a portion of the Wilshire Loan. Under this Brooks Loan, CCL is to make advances on the loan as Brooks pledges pools of receivables as collateral. Brooks also agreed that it would use a portion of its profits from use of the loan to acquire up to a $108 million portion of the Wilshire Loan.

34. In the second agreement, Sterling agreed to sell up to $108 million of the Wilshire Loan to Brooks. The agreement stated that Sterling acknowledged that Brooks' obligation to purchase interests in the Wilshire Loan and to pay for an interest in the loan was "limited solely to the availability of funds allocated pursuant to [Brooks Loan.]"

35. From June through December 1999, CCL loaned Brooks a total of $38.1 million through seven monthly advances of $4.39 million to $6.73 million. During the same period, the Defendants used $7.843 million of the Brooks Loan proceeds to fund its payments on the Wilshire Loan. Specifically, from June through December 1999, the Defendants took from $1.028 million to $1.53 million a month directly out of the Brooks Loan escrow account and applied the funds to satisfy a portion of the $1.528 million to $1.584 million May through November 1999 Wilshire Loan interest payments.

**The Beacon Loan and the Defendants'**

**Use of Beacon Loan Proceeds to Make**

**Wilshire Loan Interest Payments**

36. On January 3, 2000, CCL, as agent for its clients, agreed to lend Beacon up to $50 million to fund Beacon's purchase

- 11 -      COMPLAINT

of receivables.  Under this loan, CCL is to make advances on the loan as Beacon pledges pools of receivables as collateral.

37.  From January through July 2000, CCL loaned Beacon a total of $33.88 million.  The Defendants then used $7.372 million of Beacon Loan proceeds to fund Brooks' payments on the Wilshire Loan.  Specifically, from January through July 2000, the Defendants took from $1.014 million to $1.115 million a month directly out of the Beacon Loan escrow account and applied the funds to satisfy a portion of the $1.583 million to $1.614 million December 1999 through June 2000 Wilshire Loan interest payments.

## Defendants' Use of Brooks and Beacon
## Loan Proceeds to Make Sterling's Portion
## of the Wilshire Loan Payments

38.  In early July 1999, Dyer told J. Grayson that Sterling could not make its monthly $500,000 Wilshire Loan payments, and J. Grayson proposed a plan in which Sterling could get money from the Brooks Loan to make its Wilshire Loan payments.  J. Grayson proposed that:  (1) Dyer could start a new fund; (2) CCL would authorize Brooks to invest funds from its reserve account into this new fund; (3) Oxbow Partners could sell the new fund stock it already owned at a profit; and (4) Oxbow Partners could use that profit to make Sterling's Wilshire Loan payment.

39.  In late July 1999, the Defendants implemented J. Grayson's plan.  The Brooks Loan agreement provided that 15% of each advance would be held in a reserve account as security for CCL.  The agreements further provided that CCL would invest the

- 12 -     COMPLAINT

funds in the reserve account in U.S. Treasury securities or money market investments.  In a July 28, 1999 letter agreement, however, B. Grayson, on behalf of CCL, agreed that Brooks could invest the funds in its reserve account in "mutual funds or other pooled investments."

40.  Also in July 1999, Oxbow Fund B started a $25 million private placement offering promoted and sold by Oxbow Partners. Oxbow Fund B's offering documents stated that it would use the offering proceeds to make equity and debt investments as determined by Oxbow Partners.

41.  From July 1999 through July 2000, Brooks and Beacon invested in Oxbow Fund B a total of $8.86 million that was designated as being for its 15% reserve accounts.  These investments were wired to Oxbow Fund B directly from the escrow accounts for the Brooks and Beacon Loans.

42.  Pursuant to J. Grayson's plan, Oxbow Fund B used the Brooks and Beacon invested funds to purchase stock from Oxbow Partners that Oxbow Partners had previously acquired.  Prior to July 1999, Oxbow Partners had acquired for $1 per share a 49.99% interest in a start up technology company called Topia Ventures, Inc. ("Topia"), which as of July 1999 was still a start up company and had (and still has had) no revenues.  As Brooks and Beacon invested in Oxbow Fund B, Dyer caused Oxbow Fund B to purchase Topia stock from Oxbow Partners at $12 per share.  From September 1999 through July 2000, Oxbow Fund B transferred $7.228 million of the invested funds to Oxbow Partners.

- 13 -    COMPLAINT

43.  Oxbow Partners, purportedly with its profits from selling Oxbow Fund B Topia stock at an $11 per share mark up, used $5.5 million to pay Sterling's $500,000 August 1999 through June 2000 Wilshire Loan interest payments.

**The False and Misleading January 1999 Disclosure**

44.  In a January 26, 1999 letter, Defendants provided clients invested in Wilshire Loan participation interests with a special update on the status of the loan.  In the letter, which was signed by Defendant J. Grayson, CCL advised its clients, in part, that:

a.  Wilshire's largest client, WFSG, was forced to liquidate significant pools of mortgage loans that were serviced by Wilshire and that provided servicing rights collateralizing the Wilshire Loan;

b.  CCL had determined to sell the $160 million Wilshire Loan to Sterling.  Sterling's rights under the loan would convert into 49.9% of the shares of a new subsidiary of WFSG with a right to convert those shares into up to 47.25% of the stock of the publicly traded WFSG;

c.  Sterling agreed to buy the Wilshire Loan for $160 million with interest at the rate paid by Wilshire (prime rate + 3.75%);

d.  Sterling was an investment company associated with a broker-dealer that had been in business over 27 years and had raised over $1 billion in capital;

e.  Sterling would begin making monthly interest payments on January 25, 1999; and

f.  CCL made the December 1998 payment on the Wilshire Loan from its cash collateral account, but Sterling was obligated to reimburse the cash collateral account for the December 1998 loan payment.

- 14 -      COMPLAINT

45. By January 26, 1999, however, Defendants knew but omitted to disclose, or were reckless in failing to disclose, material information to their clients, including:

a. CCL had already agreed to release Wilshire from the $160 million loan in exchange for the convertible shares;

b. Based on WFSG's then current trading price, the convertible shares would be worth, at most, $1.923 million;

c. Sterling could terminate its agreement to purchase the Wilshire Loan at any time without further liability;

d. Sterling was a start up company that had no financial ability, or intention, to make payments on the Wilshire Loan, except to the extent it raised funds through Oxbow Fund I; and

e. Sterling had not made the interest payment that was due on January 25, 1999.

46. Moreover, despite knowing this information, Defendants appraised the market value of the Wilshire Loan participation interests for the quarter ended December 31, 1998 at the clients' full cost of the investment.

**The False and Misleading First Quarter 1999 Disclosure**

47. In April 1999, Defendants sent their clients a report for the quarter ended March 31, 1999, stating, in part, that:

a. Sterling's purchase of the Wilshire Loan was finalized; and

b. Sterling agreed to make monthly interest payments at the prime interest rate plus 3.75%.

48. By March 31, 1999, however, Defendants knew but omitted to disclose, or were reckless in failing to disclose, to their clients that:

- 15 -    COMPLAINT

a. Under the finalized agreement, Sterling was to begin making interest payments on March 25, 1999 (instead of January 25, 1999, as had been stated in CCL's January 26, 1999 letter to clients) and to make a $3.11 million initial deposit by March 31, 1999;

b. Sterling did not have the financial ability to make, and did not make, the March 1999 interest payment and initial deposit; and

c. CCL made the January, February, and March 1999 Wilshire Loan payments from the Wilshire Loan cash collateral account.

49. Despite knowing this information, Defendants again appraised the market value of the Wilshire Loan participation interests for the quarter ended March 31, 1999, at the clients' full cost of the investment and billed their clients an annualized 3% management fee for the quarter based on the appraised market value for the quarter ended December 31, 1998.

**The False and Misleading Second Quarter 1999 Disclosures**

50. In July 1999, Defendants sent their clients a report for the quarter ended June 30, 1999, on their investments in the Wilshire Loan, which stated:

a. Sterling "continue[d] to make payments under its [agreement] with [CCL]";

b. Sterling "continue[d] to provide our clients with a gross interest rate of [p]rime + 3.75%, payable monthly";

c. Sterling sold a portion of the Wilshire Loan to an unrelated third party introduced to Sterling by CCL; and

d. CCL approved the transaction and believed that it "improve[d] the overall restructure of the Wilshire [Loan] while at the same time providing for the addition of another desirable and viable party that should contribute to the overall strength of [CCL's] existing borrower, Sterling."

- 16 -    COMPLAINT

51. With respect to the Brooks Loan, Defendants advised their clients:

    a.    Brooks was formed to facilitate future acquisitions of consumer-debt receivables;

    b.    CCL had agreed to loan Brooks up to $50 million;

    c.    The loan would be collateralized by the receivables and a 15% reserve in the form of money market and/or securities that can be liquidated in 30 days for cash;

    d.    Brooks had agreed to acquire a portion of the Wilshire Loan; and

    e.    The Brooks Loan was performing in accordance with the terms of the lending agreement.

52. By June 30, 1999, however, Defendants knew but omitted to disclose, or were reckless in not disclosing, to their clients the material information that:

    a.    CCL had postponed Sterling's date for making the $3.11 million initial deposit from March 31, 1999, to January 1, 2004;

    b.    CCL had waived its right to receive the March and April Wilshire Loan payments from Sterling;

    c.    Brooks' obligation to purchase a portion of the Wilshire Loan was conditioned on CCL's lending it $50 million and was limited by funds available to Brooks from profit from use of the loan proceeds (and not the loan proceeds themselves); and

    d.    CCL and Brooks had used $1.03 million advanced under the Brooks Loan (and not Brooks' profit from use of the loan proceeds) to pay a portion of the $1.53 million May 1999 Wilshire Loan interest payment.

53. Despite knowing this information, Defendants again appraised the market value of the Wilshire Loan participation interests for the quarter ended June 30, 1999, at the clients'

- 17 -     COMPLAINT

full cost of the investment and billed their clients an annualized 3% management fee for the quarter based on the appraised full market value for the quarter ended December 31, 1998.

## The False and Misleading Third and

## Fourth Quarter 1999 Disclosures

54.   In October 1999 and January 2000, Defendants sent their clients reports for the quarters ended September 30, 1999, and December 31, 1999, respectively, on the Wilshire Loan, which stated:

> a.   Sterling "continue[d] to make payments under its [agreement] with [CCL]"; and

> b.   Sterling "continue[d] to provide our clients with a gross interest rate of [p]rime + 3.75%, payable monthly."

55.   With respect to the Brooks Loan, Defendants advised their clients:

> a.   In the third quarter, CCL had made three more advances totaling another $15.872 million;

> b.   In the fourth quarter, CCL had made another three advances, bringing the total amount of the loan to slightly more than $38 million, and the loan's outstanding balance was $36.965 million; and

> c.   The loan was performing in accordance with the terms of the lending agreement.

56.   Defendants knew but omitted to disclose, or were reckless in not disclosing, to their clients:

> a.   CCL and Brooks had used a total of $6.813 million advanced under the Brooks Loan (and not Brooks' profit from use of the loan proceeds) to pay a portion of the interest payments due on the Wilshire Loan from June through November 1999;

- 18 -      COMPLAINT

b.  CCL had allowed Brooks to invest the 15% reserve account for the Brooks Loan in Oxbow Fund B, which had used the invested funds to purchase from Oxbow Partners stock in a start up high technology company that was affiliated with Dyer and that had no revenues; and

c.  Oxbow Partners had used profits from selling the start-up, high technology's stock to Oxbow Fund B to make Sterling's interest payments on the Wilshire Loan from August through November 1999.

57.  Despite knowing this information, Defendants again appraised the market value of the Wilshire and Brooks Loans participation interests for the quarters ended September 30, 1999, and December 31, 1999, at the clients' full cost of the investment and billed their clients an annualized 3% management fee for the quarters based on the appraised market value for the previous quarter.  Moreover, Defendants continued to sell participation interests in the Wilshire and Brooks Loans at the full amount of the interest in the loan.

**The False and Misleading First Quarter 2000 Disclosure**

58.  In April 2000, Defendants sent their clients a report for the quarter ended March 31, 2000, regarding the Wilshire Loan, stating, in part, that:

a.  Sterling "continue[d] to make payments under its loan documents with [CCL]"; and

b.  Sterling "continue[d] to provide our clients with a gross interest rate of [p]rime + 3.75%, payable monthly."

59.  With respect to the Brooks Loan, Defendants advised their clients, in part, that:

- 19 -    COMPLAINT

a.  CCL had made seven advances totaling slightly more than $38 million, and the loan's outstanding balance was $35.024 million; and

b.  The loan was performing in accordance with the terms of the lending agreement.

60.  With respect to the Beacon Loan, Defendants advised their clients, in part, that:

a.  CCL had agreed to lend Beacon up to $50 million;

b.  By the end of the quarter, CCL had made three advances totaling $22.225 million but had only funded $18.788 million of the advances;

c.  Beacon's principals have successfully been involved in the purchase and sale of pools of consumer-debt receivables for 20 years; and

d.  The loan has been performing in accordance with the terms of the lending agreement.

61.  By March 31, 2000, however, Defendants knew but omitted to disclose, or were reckless in not disclosing, to their clients that:

a.  CCL and Beacon had used a total of $3.311 million advanced under the Beacon Loan to pay a portion of the December 1999 and January and February 2000 Wilshire Loan interest payments;

b.  CCL had allowed Brooks and Beacon to invest funds from the 15% reserve account for the Brooks and Beacon Loans in Oxbow Fund B, which used the invested funds to purchase from Oxbow Partners stock in a start up high technology company that was affiliated with Dyer and that had no revenues; and

c.  Oxbow Partners had used profits from selling the start-up, high technology's stock to Oxbow Fund B to make Sterling's interest payments on the Wilshire Loan from December 1999 through February 2000.

- 20 -    COMPLAINT

62.   Despite knowing this information, Defendants again appraised the market value of the Wilshire and Brooks Loans participation interests for the quarter ended March 31, 2000, at the clients' full cost of the investment and billed their clients an annualized 3% management fee for the quarter based on the appraised full market value for the previous quarter.  Moreover, Defendants continued to sell participation interests in the Wilshire, Brooks and Beacon Loans priced at the full amount of the interest in the loan.

**The False and Misleading Second Quarter 2000 Disclosure**

63.   In July 2000, Defendants sent their clients a report for the quarter ended June 30, 2000, regarding the Wilshire Loan, stating, in part, that:

> a.   Sterling "and its participants have made all payments due under the loan agreement with [CCL] on this loan";
>
> b.   CCL has "arranged for [an accounting firm] to perform . . . [a] full valuation of the Sterling purchase contract";
>
> c.   The accounting firm "concluded that [it was] not presently able to completely and accurately state the current fair market value of [the] clients' investment/collateral" because the "overhang" from the [WFSG] reorganization and the new [WFSG] management "needs additional time to prove themselves and the company's operating results to the investment community";
>
> d.   The accounting firm "indicated that a full and accurate valuation should wait for six to nine months to allow [WFSG] time to generate additional operating results";
>
> e.   CCL "has elected to reduce its fee on this investment to one-half of the normal fee until such time as an accurate valuation is done"; and

- 21 -    COMPLAINT

f.     CCL will use the accounting firm's appraisal "as the basis for its fee, and if it is less than par, which we do not anticipate, will make appropriate credits to pro-rate its fee to all clients back to January 1, 1999."

64. With respect to the Brooks Loan, Defendants advised their clients, in part, that:

a.     CCL had made seven advances totaling slightly more than $38 million, and the loan's outstanding balance was $31.894 million; and

b.     The loan was performing in accordance with the terms of the lending agreement.

65. With respect to the Beacon Loan, Defendants advised their clients, in part, that:

a.     CCL had made five advances totaling slightly more than $36.355 million, and the loan's outstanding balance was $32.455 million; and

b.     The loan was performing in accordance with the terms of the lending agreement.

66. By June 30, 2000, however, Defendants knew but omitted to disclose, or were reckless in not disclosing, to their clients that:

a.     CCL and Beacon had used a total of $3.045 million advanced under the Beacon Loan to pay a portion of the interest payments due from March through May 2000 on the Wilshire Loan; and

b.     CCL and Sterling used a total of $1.5 million from the Brooks and Beacon Loans 15% reserve account to pay Sterling's portion of the interest payments on the Wilshire Loan from March through May 2000.

67. Despite knowing this information, Defendants again appraised the market value of the Wilshire, Brooks, and Beacon Loans participation interests for the quarter ended June 30,

- 22 -     COMPLAINT

2000, at the clients' full cost of the investment. Moreover, Defendants continued to sell participation interests in the Wilshire, Brooks and Beacon Loans priced at the full amount of the interest in the loan.

**FIRST CLAIM FOR RELIEF**
**FRAUD IN THE OFFER OR SALE OF SECURITIES**
**Violation of Section 17(a) of the Securities Act**
**(Against All Defendants)**

68. Plaintiff repeats and realleges paragraphs 1 through 67 above.

69. Defendants, by engaging in the conduct described in Paragraphs 1 through 67 above, directly or indirectly, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails: (a) with scienter, employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; (c) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon the purchaser of such securities in violation of Section 17(a) of the Securities Act.

70. By reason of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act.

- 23 -    COMPLAINT

## SECOND CLAIM FOR RELIEF
## FRAUD IN CONNECTION WITH THE
## PURCHASE OR SALE OF SECURITIES

### Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 thereunder
### (Against All Defendants)

71. Plaintiff repeats and realleges paragraphs 1 through 67 above.

72. Defendants, by engaging in the conduct described in Paragraphs 1 through 67 above, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or of any facility of a national securities exchange, with scienter: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or, (c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon other persons in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

73. By reason of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

- 24 -    COMPLAINT

## THIRD CLAIM FOR RELIEF
## FRAUD IN CONNECTION WITH
## CONDUCT AS AN INVESTMENT ADVISER
### Violation of Sections 206(1)
### and 206(2) of the Advisers Act
### (Against Defendant CCL)

74.   Plaintiff repeats and realleges paragraphs 1 through 67 above.

75.   Defendant CCL, by engaging in the conduct described in Paragraphs 1 through 67 above, by use of the mails or means or instrumentalities of interstate commerce, directly or indirectly, while acting as an investment adviser:  (a) with scienter, employed devices, schemes or artifices to defraud advisory clients or prospective advisory clients; and (b) engaged in transactions, practices or courses of business which operated as a fraud or deceit upon advisory clients or prospective advisory clients in violation of Sections 206(1) and 206(2) of the Advisers Act.

76.   By reason of the foregoing, Defendant CCL violated, and unless restrained and enjoined will continue to violate, Sections 206(1) and 206(2) of the Advisers Act.

## FOURTH CLAIM FOR RELIEF
## AIDING AND ABETTING INVESTMENT ADVISER FRAUD
### Violation of Sections 206(1)
### and 206(2) of the Advisers Act
### (Against Defendants J. Grayson
### and B. Grayson)

77.   Plaintiff repeats and realleges paragraphs 1 through 67 and 74 through 76 above.

- 25 -      COMPLAINT

78. Defendants J. Grayson and B. Grayson, by engaging in the conduct described in Paragraphs 1 through 67 above, knowingly and substantially assisted Capital Consultant's violations of Sections 206(1) and 206(2) of the Advisers Act.

79. By reason of the foregoing, Defendants J. Grayson and B. Grayson aided and abetted CCL's violations of, and unless restrained and enjoined will continue to aid and abet CCL's violations of, Sections 206(1) and 206(2) of the Advisers Act.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

### I.

Issue findings of fact and conclusions of law that the Defendants committed the alleged violations;

### II.

Issue orders temporarily, preliminarily and permanently enjoining Defendants and their officers, agents, servants, employees, and attorneys-in-fact, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Sections 206(1) and 206(2) of the Advisers Act.

- 26 -     COMPLAINT

**III.**

Issue a temporary restraining order and a preliminary injunction freezing the assets of each of the Defendants, and appointing a receiver over Defendant CCL.

**IV.**

Issue an order granting such other and further relief as this Court may determine to be just, equitable and necessary.

**V.**

Issue an order imposing civil money penalties against the Defendants pursuant to Section 20(d) of the Securities Act, Section 21(d)(3) of the Exchange Act and Section 209(e) of the Advisers Act.

**VI.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

Dated:    September _18_, 2000

E. David Hwa
Cal. Bar # 131857
(323) 965-3998
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION

- 27 -    COMPLAINT